UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TREIBER & STRAUB INCORPORATED,
JEWELERS MUTUAL INSURANCE COMPANY,

        Plaintiffs,

    v.                                    Case No. 17-cv-0386-bhl

STANLEY CONVERGENT SECURITY SOLUTIONS INC,

        Defendant.

---

## ORDER GRANTING SUMMARY JUDGMENT

---

        In July 2016, burglars broke into Treiber & Straub Jewelers (Treiber) and absconded with approximately $4,738,000 in watches, jewelry, and other inventory. Treiber made a claim on its insurance policy and recovered most of the loss from its insurer, Jewelers Mutual Insurance Company (Jewelers Mutual), subject to a deductible. Thereafter, Treiber and its insurer brought this lawsuit, seeking to shift the financial cost of the heist onto Stanley Convergent Security Solutions (Stanley), the company with whom Treiber has, for years, contracted to provide security services on its premises. Plaintiffs' complaint alleges that Stanley's negligence allowed the multi-million-dollar theft to happen.

        Stanley now seeks summary judgment, arguing that a clause in its contracts with Treiber expressly disclaims any liability based on negligence. In response, Plaintiffs acknowledge the contractual disclaimer but insist Stanley cannot enforce the clause because it was not a party to the original contract, which Treiber signed with Stanley's predecessor, Honeywell Inc., Home and Building Control (Honeywell). Plaintiffs also contend that the doctrine of successor liability bars Stanley from using the disclaimer as a defense.

        Plaintiffs are wrong on both theories. The record establishes that Stanley is the proper assignee of the agreement. Indeed, the parties have long performed in accordance with the contracts' terms and Stanley is therefore entitled to enforce the contractual limitation on liability to which Treiber agreed. Stanley's motion for summary judgment will be granted.

# FACTUAL BACKGROUND[1]

Treiber is a high-end watch repair and jewelry store owned by Michael and Gayle Straub. (ECF No. 57 at 3.) Sometime in 2000, the store moved from Wauwatosa to Brookfield, Wisconsin. (ECF No. 58, Ex. 1 at 10.) In order to obtain security services for the new location, Treiber entered into two "Installation and Service Agreements" with Honeywell. (ECF No. 57 at 4.)

Per Installation and Service Agreement No. 718-01-99585 (Agreement 85), Honeywell sold Treiber an "Intrusion/Holdup/Sprinkler Supervisory" system to be maintained on a time and materials basis by Honeywell for a term of 60 months and for consecutive terms of one year, unless either party gave written notice of termination 60 days prior to the end of a term of the contract. (*Id.*) Per Installation and Service Agreement No. 718-01-99586 (Agreement 86), Honeywell sold Treiber an "RF UL Grade AA Communication Transmission" system to be monitored by Honeywell for $128 per month for a term of 60 months and for consecutive terms of one year, unless either party gave written notice of termination 60 days prior to the end of a term of the contract. (*Id.*) Neither party ever provided notice of termination for either agreement. (*Id.*)

Both Agreement 85 and Agreement 86 contained, in part, the following provisions:

> 4. Liquidated Damages and Honeywell's limits of liability.
>
>> A. It is understood and agreed by the parties hereto that . . . Honeywell is not liable for losses which may occur in cases of malfunction or nonfunction of any system provided by Honeywell, that Honeywell is not liable for losses which may occur in the monitoring, repairing, signal handling or dispatching aspects of the service, even if due to Honeywell's negligence or failure of performance; that Honeywell is not liable for losses resulting from failure to warn or inadequate training; that Honeywell is not an insurer; and that insurance covering personal injury, property loss, damage to and on Customer's premises must be obtained and/or maintained by Customer.
>
>> . . .

---

[1] These facts are drawn from the parties' proposed statements of undisputed facts and responses thereto (ECF Nos. 57, 63, & 67), as well as the First Amended Complaint. (ECF No. 34.) Disputed facts are viewed in the light most favorable to the non-moving party.

8. Obligations of Honeywell; Limitations.

    A. Honeywell shall not be held responsible or liable for delay in Installation of the system or Interruption of service, due to strikes, lockouts, riots, floods, fires, lightning, acts of God or any cause beyond the control of Honeywell, including interruptions in telephone service. Honeywell will not be required to perform installation or supply service to Customer while any such cause shall continue.

    B. For those premises where Customer Service Center monitoring is provided, Honeywell, upon receipt of an alarm signal from Customer's premises, shall (unless previously instructed otherwise by Customer), make a reasonable effort to transmit the alarm promptly to the police, fire department, medical agency or customer designated agency having jurisdiction or responsibility. Honeywell shall also make a reasonable effort to notify Customer's designated representative by telephone of every genuine alarm received unless instructed to do otherwise by Customer.

    C. Customer understands that if the system installed under this agreement is monitored, due to the nature of the method used for communicating alarm signals to the Customer Service Center, there may be times when the communication method is not able to transmit signals and Honeywell will not receive alarm signals. . . . Customer understands that Honeywell offers several levels of communication methods of alarm signals to the Customer Service Center and that the Services described on the front page of this agreement and on the Schedule of Service and Protection have been chosen by Customer after considering and balancing the levels of protection afforded by various communication methods and related costs. Customer acknowledges and agrees that Customer is solely responsible for the selection of the type of communication method and whether the utilization of more than one communication method is required.

11. Assignment.
This agreement may be assigned by the Customer or Honeywell provided that the other party receives thirty (30) days advance written notice within which time the assignment may be accepted or the agreement may be cancelled.

12. No Subrogation.
Customer does hereby for itself and other parties claiming under it, release and discharge Honeywell from and against all claims arising from hazards covered by Customer's insurance, it being expressly agreed and understood

that no insurance company or insurer will have any right of subrogation against Honeywell.

(*Id.* at 5-8.)

In 2004, Honeywell sold its "Security Monitoring Business" to SecurityCo, Inc. (SecurityCo) through an Asset Purchase Agreement. (*Id.* at 8.) The sale included the "business of marketing and providing installation, maintenance and monitoring services for stand-alone and integrated electronic security systems to commercial and residential customers," defined as the "Business." (ECF No. 68 at 8.) The assets sold included "all contracts [and] agreements" relating to the Business "except those related to Excluded Assets." (*Id.*) Honeywell's contract with Treiber was not related to the "Excluded Assets." (*Id.*)

On January 24, 2005, SecurityCo contracted with Treiber to sell additional transmitters, detectors, and related equipment in a rider to Agreement 86 titled "Honeywell Security Monitoring Contract Rider." (ECF No. 57 at 9.) This document specifically referred to Agreement 86 by contract number and stated in pertinent part: "This Rider shall be attached to and made a part thereof the existing valid contract between (Contractor) SecurityCo, Inc., Successor to Honeywell Security Monitoring and Treiber & Straub." (*Id.*)

On August 12, 2005, SecurityCo changed its name to HSM Electronic Protection Services, Inc. (HSM). (*Id.*) On January 11, 2008, HSM changed its name to Stanley Convergent Security Solutions, Inc. (*Id.* at 9-10.)

On August 13, 2010, Treiber and Stanley supplemented and amended their prior agreement through a "Contract Rider," which stated that "any additional service and equipment provided pursuant to this Rider shall be governed by the provisions of the Agreement, including without limitation the provision of Section 4 (Liquidated Damages and SCSS Limits of Liability)." (*Id.* at 10.) Stanley issued Treiber regular invoices bearing the original agreement number of Agreement 86. (*Id.* at 12.) Treiber always paid. (*Id.*)

While at the Brookfield location, Treiber frequently experienced internet connectivity issues. (*Id.*) Neither its internet service provider, Time Warner Cable, nor Stanley managed to resolve these issues. (*Id.* at 13.) Due to the routine and trivial nature of the connectivity problems, Mr. Straub sent a written instruction to Stanley stating, "Effective July 24, 2015 we are now requesting that if there is an internet failure, we do not want to be called." (*Id.*) Stanley responded and informed Mr. Straub it would "not take any action on" an internet communication failure sign.

(*Id.* at 14.) Mr. Straub later confirmed that he did not want Stanley to take *any* action upon receiving an internet communication failure signal, including calling the police. (*Id.*)

This directive proved inopportune on July 11, 2016, when burglars severed the store's telephone line and internet cable connections and raided the main vault. (ECF No. 34 at 2-3.) Consistent with Mr. Straub's express instructions, despite receiving the internet failure communication signal, no one at Stanley alerted anyone at Treiber. (ECF No. 63 at 17.) Treiber subsequently filed an insurance claim with its provider, Jewelers Mutual. (ECF No. 57 at 3.) Jewelers Mutual brought this subrogation action to recover the proceeds paid on Treiber's insurance claim.[2] (ECF No. 34.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* at 242. If the parties assert different views of the facts, the Court must view the record in the light most favorable to the non-moving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

Plaintiffs bring two claims, one for negligence, and one for negligent misrepresentation. Collectively, they seek $4,738,716.83, with $10,000 allocated to Treiber, and the remainder to Jewelers Mutual. While both claims are plainly barred by the terms of the contracts in issue, Plaintiffs argue those terms should not apply because assignment of the contract was improper. Additionally, even if assignment was proper, they insist successor liability prevents Stanley from enforcing the contract's original terms. Because neither argument has merit, Stanley's motion for summary judgment will be granted.

**I.    Agreements 85 and 86 Plainly Prohibit Negligence and Subrogation Actions.**

---

[2] Treiber is part of this action because its policy with Jewelers Mutual contained a $10,000 deductible for inventory, which it seeks to recover from Stanley. (ECF No. 64 at 18.)

"When the terms of a contract are clear and unambiguous," Wisconsin courts "construe the contract's language according to its literal meaning." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015). "Ultimately, the court's role 'is . . . to determine what the parties contracted to do.'" *Id.* at 686 (quoting *Marion v. Orson's Camera Centers, Inc.*, 138 N.W.2d 733, 736 (Wis. 1966)).

Here, the contract is unequivocal. By its clear and unambiguous terms, it provides that "Honeywell is not liable for losses which may occur in the monitoring, repairing, signal handling or dispatching aspects of the service, even if due to Honeywell's negligence or failure of performance." (ECF No. 4, Ex. A, at 2.) Further, "no insurance company or insurer will have any right of subrogation against Honeywell." (*Id.* at 3.) The Court needs no complex canons of construction or Merriam-Webster citations to interpret these clauses. They plainly prohibit negligence and subrogation actions. Therefore, as long as these terms govern Treiber's relationship with Stanley, the negligence claims raised in this case are barred.

## II. Even in the Absence of Documentation of Treiber's Formal Approval of an Assignment, the Agreement Remains Enforceable Against Treiber.

Plaintiffs argue that failure to comply with the contract's "Assignment" provision invalidates the negligence and subrogation waivers. They point to provisions in the agreements that required 30 days' advance written notice of any assignment. (*Id.* at 2.) Because Stanley has failed to produce any such written notice, they insist they are free to disregard the contractual limitations on liability found in the original contract. (ECF No. 63 at 21.) Plaintiffs' argument fails because the record shows Treiber has, by and through its actions, waived any objection to the assignment, whether through strict enforcement of the assignment clause or otherwise.

In Wisconsin, waiver is "defined as a voluntary and intentional relinquishment of a known right." *Attoe v. State Farm Mut. Auto. Ins. Co.*, 153 N.W.2d 575, 579 (Wis. 1967). Courts "focus[] on the intent of the party against whom waiver is asserted." *Milas v. Labor Ass'n of Wis., Inc.*, 571 N.W.2d 656, 659 (Wis. 1997). "While the party claiming waiver need not prove an actual intent to waive, it must show that the waiving party 'had at the time knowledge, actual or constructive, of the existence of his rights or of the facts upon which they depended.'" *Moya v. Walgreen Co.*, No. 18-CV-1785-JPS, 2019 WL 400618, at *3 (E.D. Wis. 2019) (quoting *Bade v. Badger Mut. Ins. Co.*, 142 N.W.2d 218, 222 (Wis. 1996)). Thus, intention to waive may "be inferred from the parties' conduct." *Moya*, 2019 WL 400618, at *3 (citing *Attoe*, 153 N.W.2d at 579).

After the Honeywell asset sale, Treiber continued to pay, interact with, and accept services from Stanley (including when it was named SecurityCo and HSM) for more than a decade. (*See* ECF No. 57 at 8-14.) Mr. Straub signed a 2005 contract rider specifically acknowledging SecurityCo as the successor to Honeywell. (ECF No. 57 at 9-10.) He also admitted, "[A]ll I remember is that . . . Honeywell . . . signed off that part of their company . . . and pretty much that Stanley was taking over." (ECF No. 63 at 11-12.) When asked how Stanley became his monitoring company, Mr. Straub stated, "I don't totally understand it, but to me, probably at the time, I just thought maybe that Honeywell was selling of[f] part of their assets or whatever." (*Id.* at 12-13.)

The Wisconsin Supreme Court has found nearly identical conduct indicative of intent to waive. *See Katz v. Miller*, 133 N.W. 1091, 1093 (Wis. 1912); *Baker v. McDel Corp.*, 191 N.W.2d 846, 851 (Wis. 1971). In *Katz*, the Court held that the trustees of a parcel of real estate waived their right to enforce a covenant against assignment. Despite contractual language that required written consent to any assignment, the trustees were deemed to have waived any breach of this provision by their continued acceptance of rent from the assignee for a year, evidencing their full knowledge of the assignment. *Id.* Similarly, in *Baker*, a lessee improperly assigned a lease to the defendant. 191 N.W.2d at 851. But the lessor knew of the defendant, accepted its checks, and conducted business directly with it. *Id.* "Such conduct clearly establishe[d]" that the lessor "waived the contract provision as to assignment." *Id.*

To hold Treiber's contracts with Stanley unenforceable, the Court would have to ignore Treiber's longstanding performance and acceptance of Stanley's service, a position that would be utterly inconsistent with its current position. Such a holding would contradict established Wisconsin law and lend judicial credence to the absurd notion that a high-end jeweler continued to pay—for 15 years—a $3,435.48 annual service charge (ECF No. 57 at 16) to a company with which it had no contractual relationship. Private enterprise rarely abandons its revenue so frivolously. There is nothing in the record to indicate that it did so here.

Nonetheless, Plaintiffs contend that, even if they continued to pay the service charge, they only did so because they lacked actual or constructive knowledge that Stanley was separate from Honeywell. Thus, prior to this lawsuit, they insist they never knew they had the authority to cancel the contract under the assignment provision. At a glance, Treiber's knowledge or lack thereof might appear to raise a genuine issue of material fact. And the summary judgment stage is not the

proper place to adjudicate genuine disputes of material fact. Indeed, the Court is required to construe the facts in the light most favorable to the non-moving party. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 853 (7th Cir. 2017). But this edict does not require us to credulously accept the non-movant's every fantastic utterance like a guileless child. *See Anderson*, 477 U.S. at 255 ("[A]ll *justifiable* inferences are to be drawn in [non-movant's] favor.") (emphasis added). Given the record, Plaintiffs' proposed inference is simply not justifiable.

First, Mr. Straub's deposition testimony demonstrates that, as a sophisticated businessman, he understood that the Honeywell asset sale effected Stanley's takeover of the security monitoring service. (*See* ECF No. 63 at 11-13.) This alone is fatal to his plea of ignorance. But what's more, Mr. Straub also signed a contract rider, which specifically identified SecurityCo (later Stanley) as the successor to Honeywell. (ECF No. 57 at 9-10.) "'It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Appleton Papers Inc. v. Mason & Dixon Lines, Inc.*, No. 03-C-415, 2005 WL 8162776, at *4 (E.D. Wis. 2005) (quoting *Paper Exp., Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992)). This is so even where the signatory claims not to have read the contract. *See Appleton Papers*, 2005 WL 8162776, at *4 ("Obviously, a party who signs a contract cannot avoid its terms by failing to read them."). Therefore, when he signed the 2005 contract rider, Mr. Straub confirmed at least constructive knowledge of the security monitoring transition. As a result, the Court cannot entertain his suggestion of ignorance.

### III. The General Rule Against Successor Liability Does Not Allow Treiber to Avoid Its Contractual Liability Waiver.

According to Plaintiffs, even assuming waiver of the assignment provision, the contract with Stanley is still unenforceable because "[t]he general rule of successor liability in the context of asset purchase agreements is that a 'corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation,' subject to certain exceptions." *Columbia Propane, L.P. v. Wis. Gas Co.*, 661 N.W.2d 776, 784 (Wis. 2003) (quoting *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 439 (7th Cir. 1977)). Plaintiffs are confused about basic corporate law.

It is true that a buyer of assets from a corporate entity does not typically assume unrelated liabilities of the corporation. *See Tsareff v. ManWeb Services, Inc.*, 794 F.3d 841, 845 (7th Cir. 2015) (Generally, "where one company sells its assets to another company, the latter is not liable

for the debts and liabilities of the seller."); *Amantes v. B & R Machine, Inc.*, 610 F. Supp. 2d 979, 984 (W.D. Wis. 2009) (noting the general rule that a corporation purchasing another's assets does not succeed to liabilities of the seller). This is in contrast to a stock purchase in which the buyer acquires the corporation itself, including both its corporate assets and liabilities. *See Travis v. Harris Corp.*, 565 F.2d 443, 446-47 (7th Cir. 1977) ("Responsibility for disposition of assets of a corporation ultimately rests with its owners, the shareholders. They must respond financially to claims of negligence.") (quoting *Turner v. Bituminous Casualty Co.*, 244 N.W.2d 873, 894 (Mich. 1976) (Coleman, J., dissenting)).

These general principles are uncontroversial, but they do not lead to the result Plaintiffs seek. Even in the context of an asset purchase, the acquirer can agree to take on liabilities associated with the acquired assets. Wisconsin law recognizes that a purchasing corporation is subject to the liabilities of the selling corporation "when the purchasing corporation expressly or impliedly agree[s] to assume the selling corporation's liability." *Fish v. Amsted Indus., Inc.*, 376 N.W.2d 820, 823 (Wis. 1985) (quoting *Leannais*, 565 F.2d at 439). That is precisely what happened here.

The record shows that the underlying transaction between Stanley and Honeywell was an asset sale, not a stock acquisition, and the assets Stanley acquired consisted of Honeywell's Security Monitoring Business. (ECF No. 68 at 8.) In the Asset Purchase Agreement, Stanley (then known as SecurityCo) specifically agreed to purchase all the "rights, obligations, and liabilities" of the Security Monitoring Business, including all the rights, obligations, and liabilities arising under Honeywell's contracts with Treiber. (*Id.*) As a result, consistent with basic corporate and contract law, the Asset Purchase Agreement saddled SecurityCo, which later became Stanley, with the responsibility of fulfilling the contracts and agreements Honeywell had in place. (*Id.*) Thus, Stanley continued to provide security services to Treiber, and Treiber continued to pay Stanley for those services—all according to the underlying contractual terms and conditions, which remained effective. There is nothing in the record or in basic corporate law that would allow Treiber to accept Stanley's services under the contract on the one hand, only to later, on the other hand, insist the express terms and conditions associated with those services no longer apply.

Treiber's confused invocation of the doctrine of successor liability is entirely misplaced. Successor liability is an equitable doctrine applied to prevent financially troubled corporate entities from selling off assets to obstruct creditors. *See Veritas Steel, LLC v. Lunda Constr. Co.*, 937

N.W.2d 19, 24 (Wis. 2020) (noting that the "general rule against successor liability was designed to protect a bona fide purchaser from assuming the liabilities of a predecessor corporation"). Thus, if Honeywell had racked up substantial liabilities and then transferred its assets to Stanley to put them beyond its creditors' reach, Honeywell's creditors might well invoke the doctrine of successor liability to try to pursue recovery from Stanley. But there is no suggestion that Honeywell's sale of its Security Monitoring Business was accomplished to defraud Treiber or any Honeywell creditors. Indeed, Treiber's claims in this case arose from a burglary that occurred 12 years after Honeywell sold its assets to Stanley. The doctrine of successor liability simply has no application here.

## CONCLUSION

In denying Stanley's motion to dismiss (ECF No. 14), this Court noted an absence of evidence demonstrating a through-line from the original Honeywell contracts to Stanley. Acting with a healthy degree of skepticism, the Court allowed the case to proceed. But discovery uncovered contract riders that render continued skepticism untenable. The original Honeywell contracts govern. Accordingly,

**IT IS HEREBY ORDERED** that Stanley's Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 56) is **GRANTED**, and the case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on November 16, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge